RR v. City of Palestine Good morning, Your Honors. I'm Jim Allison for the City of Palestine in Anderson County, Texas. May it please the Court. This de novo review will determine whether the 1995 preemption provisions of the Interstate Commerce Termination Act preempted the 1954 employment agreement between the City of Palestine, Anderson County, and the railroad, as later assumed by the Bonn-Bonk decision in Frank's Investment v. Union Pacific told us that the appropriate preemption questions are, what does the state seek to regulate, and does the proposed regulation burden rail transportation? This Court's also noted that there's a presumption against preemption in areas generally reserved to the states, such as contract matters, and that voluntary contracts are not preempted. So I will briefly discuss the two main points, that one, the Palestine Agreement does not regulate nor unreasonably interfere with rail transportation, and it is a voluntary agreement, both voluntarily entered into and voluntarily assumed by the Union Pacific Railroad. The 1954 Palestine Agreement replaced an earlier agreement that had also been in place for many years, and that had been upheld by the U.S. Supreme Court. The 1954 agreement actually released the railroad from the provisions of the prior agreement and prior court judgment, released them from any obligation to continue to maintain their headquarters at Palestine. That agreement, as reflected in the record excerpts, as I say, set aside and released the railroad from its prior obligations, both as encompassed in its agreement, as well as in what's called the 1914 judgment, and instead substituted this new requirement that they maintain a percentage of their non-operating employees. I emphasize that because it clearly sets aside and says you're not required to maintain any of your transportation operating employees. No trains, no locomotives, no repair crews, nothing of that nature. This agreement will only concern your maintaining some non-operating employees there. Over the years, that obligation has further decreased. As the railroads have merged, as they've been able to reduce their non-operating employees, it now is down to 0.52 percent of the total non-operating employees of Union Pacific. Approximately 70 employees out of 14,000 non-operating employees is all that's now required under the Palestine agreement to be performed by Union Pacific. Union Pacific says that, well, we've got some old facilities there and we would have to spend a lot of money to repair, rehabilitate, replace those facilities. Yet, of course, the record shows that they're not required to maintain that facility there by this agreement. There's nothing in the terms that says that. In fact, the agreement specifically says they can tear down and remove any facilities that are there. So, what we're left with is that the agreement itself, looking to its terms, gives the railroad all the options to decide how to meet that employment requirement. Out of 14,000 employees, to keep 0.52 percent there, they have at least 200 separate options if they were to take 70 employees out of each of those and look to meet this obligation by having them at Palestine. There's no evidence that they've considered anything other than the proposed cost to replace their car repair facility. Allison, I'm assuming you're going to get around to telling me what this has to do with preemption. I mean, it sounds like an argument that is it's not economically infeasible for the railroad to remain in Palestine. That's what it sounds like you're telling me. It is. Tell me what that has to do with preemption. Well, number one, preemption, the fact that the railroad may incur additional cost has been held not to be a basis for preemption. The railroad is not entitled to increase profits, not entitled to avoid costs from its operations. Preemption is to avoid interference. If there's no interference, there's no preemption. The fact that they may choose to keep a repair car there as their means of fulfilling their employment requirement is their choice, and those costs are for them to decide, not the city of Palestine's not requiring that. We're not interfering with their operations. So the fact that they claim they would spend more money to keep doing that is not relevant to preemption, Your Honor. You're correct in that, and that's why I pointed out that's the only evidence they've offered to try to demonstrate any interference in rail transportation by this agreement. In fact, they've admitted that their rail car repair facility is not directly related to rail transportation. So the agreement doesn't require the railroad to do anything in Palestine? I'm sorry? The agreement doesn't require the railroad, Union Pacific, to do anything in Palestine? Only to maintain that 0.52% employees, any employees they choose, as long as they're non-operating. It can't be their operating employees, can't be their railroad operating employees, it's got to be other employees. It's an economic employment development contract, just like any other. So their requirement is so de minimis that it does not rise to the level of preemption, that's your argument? It is de minimis, it does not rise to the level of interference, and it does not affect rail transportation. As this court held, not every regulation, much less contract, that touches on railroads constitutes interference or regulation. And as I say, this agreement was entered into because the International Great Northern was in bankruptcy, and they were faced with we either liquidate and go out of business, or we renegotiate this so we can get a merger with Missouri Pacific. Both the city, county, and the railroad, and the citizens agreed, we're going to release you from your requirement to keep your headquarters here in return for keeping a small number of your employees here, and that then went on to be in bankruptcy. And the railroad also then had a choice. They could have, of course, dissolved and liquidated and been released from this agreement, but they wanted to merge with the Union Pacific, and the Union Pacific voluntarily, in order to get all the assets of the Missouri Pacific, said we'll take the obligations of this agreement in order to get and maintain those assets. So there's no express preemption, there's no as-applied preemption, because it's not the city and not the county that's determining what employees are maintained there. As I say, the second point, of course, is that there is a, in this case, a very clear voluntary agreement. This dates back, as noted by both parties, to a very early agreement to bring the railroad to Palestine and Anderson County. That agreement predates any state regulation of these types of the so-called shop acts, and then when the state came along after that agreement was entered into, after the city, county, and its citizens had put up a considerable amount of local funds and property to bring the railroad there, then the state adopted an act that said, well, if you have a contract that says you'll keep your headquarters somewhere and you violate that contract, you'll lose your charter. At that point, the railroads were all chartered by the state. That was upheld in the 1914 agreement, no question, litigation, and the U.S. Supreme Court upheld that agreement and the shop act that said, if you don't do that, then you'll lose your charter. But by 54, all parties had agreed that that no longer was tenable. The International Great Northern needed to move on, and rather than liquidate, it wanted to merge, and so in order to do that, all parties sat down and mutually agreed to enter into this agreement, the 54-Palestine agreement, and there's no indication of that in either the negotiation of that agreement, its later assumption by the Missouri Pacific, or in this case, the very relevant assumption of it by the Union Pacific, that the city or county did anything to coerce the railroad into that decision. It was purely a voluntary, market-driven, profit-desiring decision on the part, in this case now, of Union Pacific, that in order for us to take the full benefit of all assets of the Missouri Pacific, we're willing to undertake this obligation. That type of voluntary agreement is not and cannot be the subject of preemption. So, in summary, we've got a situation here where the railroad has decided that it wants the benefit of both ends of its bargain. It wants to continue to have all of the assets that it acquired from the Missouri Pacific, the Missouri Pacific acquired from the that it freely undertook at the time that it assumed and merged to obtain those very assets. All that the city of Palestine and Anderson County are asking is for the railroad to continue to perform the minute employment obligation that it agreed to do at the time that it— Council, doesn't Freiburg v. Kansas City Southern Railroad indicate that the ICCTA preempts this 1954 agreement? No, I don't think so. I think Freiburg indicates that there are circumstances where you can have interference. Even a contract could be interfering, but under the facts of this case, there clearly is no such interference. We're not asking them to move a track. We're not asking them to stop a train or run a train, anything of that nature. All of that is not touched at all by the The only thing they've agreed to do and this agreement provides that they will do is keep a small percentage of non-operating employees. They're very different from Freiburg and other cases in which there was preemption because there was a direct connection between the actions of the ICCTA and Freiburg. I don't think that this contract is not preempted and that it should be upheld and that this court should reverse the trial court ruling. Thank you. Thank you, Your Honor. My name is Scott Ballinger, here for the Union Pacific Railroad. Let me start here. I don't think that there is any doubt that the 1889 Texas Office Shops Act would be preempted today if it were still on the books. The Texas legislature basically acknowledged that that statute was preempted when it repealed it in 2007. So the question is, for this court, is whether there is anything to this obligation for the Union Pacific to maintain employees in Palestine beyond the Office Shops Act of 1889, whether this obligation should be regarded as a creature of the Office Shops Act still, or instead as the sort of voluntary agreement that I think everyone in the courtroom would recognize is immune from preemption. Truly voluntary agreements aren't preempted by ICCTA. But this court has actually already done the hard part of the historical analysis in its 1977 city of Palestine decision. The key point is that there was a foreclosure sale in 1911 which wiped out all of the prior contractual obligations of the prior railroad. This court recognized that the 1872 promise to maintain shops and offices in Palestine was a personal obligation that would not have bound the new company but for the Office Shops Act of 1889. Both the state courts and the Supreme Court of the United States recognized 100 years ago that this obligation as of 1911 was no longer a contractual promise but had become a statutory obligation under the Office Shops Act. And this court recognized all of that history in 1977 in its city of Palestine decision. So the question then becomes, did anything happen in 1954 to transform what was at that point clearly a preempted or was a state law statutory obligation wasn't preempted yet because we didn't have ICCTA. But did anything happen in 1954 to transform that statutory obligation back into the sort of voluntary contractual bargain that Judge Wilkinson talked about in the PCS phosphate case. The sort of voluntary exchange for value that represents the railroad's own determination and admission that an exchange for value is in the best interest of the national rail network. And the district court correctly recognized that the answer is no. That the 1954 agreement was simply a perpetuation and restructuring of the requirements of the Office Shops Act. The Missouri Pacific was not given an opportunity to elect out of this obligation to maintain a substantial workforce in Palestine. Its only choice was to take the obligation in its form as represented by the 1914 judgment which prevented it from merging with the International and Great Northern or to agree to a restructuring of the obligation essentially expressing it as a smaller piece of a bigger pie. Rather than all of the International and Great Northern's office and shop employees being located in Palestine, they would accept a state courts would restructure the obligation as four and a half percent of the Missouri Pacific's office and shop workers. And it amounted to the same thing. It was meant to be a restatement of the same obligation that would keep the then existing operations in Palestine open or at least of similar size. And the net effect was that the Missouri Pacific and its subsidiary, the International and Great Northern, could merge without the operation of the Office Shops Act then forcing the Missouri Pacific to move its entire headquarters from St. Louis to Palestine which everyone understood was essentially impossible. This is not the sort of voluntary undertaking that the Fourth Circuit was talking about in the PCS phosphate case. The only reason for Missouri Pacific to agree to this 1954 agreement was to be able to merge with its subsidiary. The only thing that Missouri Pacific got out of the 1954 agreement was a mild restructuring of the obligations of Texas statutory law at the time which were non-dischargeable in bankruptcy under the then bankruptcy code that would allow Missouri Pacific and its subsidiary to do the thing that the bankruptcy court and everyone involved recognized had to happen. Those railroads needed to merge to escape from bankruptcy and the Missouri Pacific obviously couldn't move all of its headquarters, offices, and shops from St. Louis to Palestine. So the fact that this agreement was coerced by state statutory law means that it is regulation within the meaning of 49 USC 10501B which preempts state regulation of rail transportation. It's regulation because it was and it's regulation of rail transportation because 49 USC 101029 defines transportation to include all railroad facilities and all services related to the transportation of freight by rail. If the 1954 agreement was a state statute we would all I think look at it and say oh that is an attempted state regulation of rail transportation that is preempted both categorically and as applied under the Franks and Freiburg cases. It's preempted categorically, Judge Graves, under the Freiburg case because it regulates railroad facilities and employees as such. This isn't a generally applicable state law with incidental effects on railroads like was considered in the Franks case for example or the Barois case. This is a law that applied only to railroads because they're railroads. It is a regulation of railroads as such and therefore it is categorically preempted. The city and county tried to evade that conclusion by arguing that Union Pacific could comply somehow by stationing employees and other employees in Palestine, employees whose jobs do not relate to the services related to the transportation of freight. And the District Court correctly found that there are no such people, that Union Pacific is a one-trick pony. Union Pacific Railroad is the operating subsidiary of the Union Pacific Corporation. All that it does is run a railroad. But even if that were not true and Union Pacific were somehow a conglomerate that also ran a fast food business or a bakery or something and had non-railroad employees, stationing those employees in Palestine would not satisfy this agreement. The 1954 agreement says that Union Pacific has to station office and shop employees in Palestine and office and shop employees are defined specifically as people whose jobs are properly classified and reportable to the Surface Transportation Board under particular job classification codes. These are the job classification codes that the Surface Transportation Board uses to regulate rail transportation. They are found in 49 CFR 1245.5 and all of these people provide services related to the transportation of freight by rail within the meaning of Section 101029. That is why the Surface Transportation Board includes their salaries in the rate base when it determines how much Union Pacific can charge for freight transportation services. All of these people are properly classified and reportable to the STB as railroad employees because the STB considers their salaries to be part of the cost of providing rail transportation. So even if it were true, and it's not, that Union Pacific had some non-railroad business that it could relocate to Palestine, doing so wouldn't satisfy the terms of this agreement. The terms of this agreement requires that Union Pacific station railroad employees in Palestine. Now my friend wants to say that these aren't operating employees and tries to confine the scope of preemption essentially to the Transportation Department, to the engineers and conductors who ride around on trains. Those people are providing freight transportation, but the statute was deliberate, the preemption clause was deliberately written more broadly to include people who provide services related to freight transportation. Within the meaning of that provision, numerous courts have recognized that ticketing agencies that sell freight transportation services at the front end and receive freight for the railroad are providing services related to the transportation of freight by rail and that attempted state regulation of ticketing agencies is therefore preempted by it. Well the people in Palestine who process claims for freight that is damaged during shipment are similarly providing services related to the transportation of freight by rail. The people who in Palestine who repair cars, freight cars and hopper cars, are providing services related to the transportation of freight in the hopper cars and boxcars that they are repairing. So for all of those reasons, the city and county's interpretation of ICTA's preemption clause is categorical preemption. I don't think the court needs to go any farther than categorical preemption, but the district court also held in the alternative that in any event this obligation would be preempted as applied. The railroad presented undisputed summary judgment evidence demonstrating that maintaining the present operations in Palestine will cost between 67 and 93 million dollars in the near term in capital expenditures, that these operations degrade the operational efficiency of the entire network by forcing the railroad to route cars hundreds or even thousands of miles out of their way to Palestine for repair, and that dividing office functions like the claims department between the Omaha headquarters and an outpost in Palestine 800 miles away is inefficient and undesirable. The district court correctly held that the city and county don't dispute any of those facts. They don't really contest them on appeal either. Instead, I understand the city and county to be making several legal arguments. First, they say that all of this is just money and economic burdens don't count. That's wrong as a matter of both fact and law. As a matter of fact, the district court recognized that Union Pacific presented undisputed evidence of operational burdens on the railroad, not just an economic cost. And as a matter of law, there's no exception to ICTA preemption that allows states to regulate railroad transportation if the only effect of that regulation is economic. Second, the city and county argued that these facilities in Palestine are so run down at this point only because Union Pacific has chosen not to invest in them. To be clear, Union Pacific has done a lot in recent years to keep these facilities open, including, I think, spending $400,000 on the claims department building since 2018, because that building is essentially falling down. But the thing that Union Pacific hasn't done is make a gigantic investment in modernizing these facilities, and that's because it never made sense to do so. These facilities were designed and cited as a steam locomotive repair facility for a regional Texas railroad in the 1870s. They have never made sense as a design or a location for a car repair shop for a continental scale railroad headquartered in Nebraska in the 2020s. And nothing about ICTA requires the railroad to make investments in locations that don't make sense. And, your honors, this sort of local employment requirement isn't costless. The cost falls on every other community where the railroad does business. It falls on Dupo, Illinois and DeSoto, Missouri, where Union Pacific's more efficient car shops are located. It falls on shippers by rail who have to pay more to ship freight. And it falls on the general public, which, even as we speak, is experiencing a massive supply chain crisis, in part because the railroad shipping is tangled up. Again, the city and county argue that Union Pacific could avoid these burdens by stationing some other group of employees in Palestine. In the context of categorical preemption, the answer is anyone that we could station in Palestine that would satisfy this agreement is providing services related to rail transportation. But in the burden context of as-applied preemption, the answer is it's just not realistic to think that Union Pacific could identify 70 office professionals who want to move from Omaha to Palestine, you know, the legal department or something like that. To be honest, the existing facilities and workforce in Palestine are the only reasons why it makes sense for Union Pacific to have office facilities in Palestine at all. If the solution were to try to recruit and retain an entirely different professional workforce in Palestine, that would be even more unrealistic and burdensome than the status quo. Now, there's also an Anti-Injunction Act issue in the case, and they've presented a Rule 19 indispensable parties argument. I think the District Court correctly recognized that the Anti-Injunction Act only forbids injunctions against pending state court proceedings. And at the time Union Pacific filed this case, there was no pending state court proceeding. They have subsequently filed a state court proceeding to enforce the separate 1955 judgment. Union Pacific sought no relief in federal court as to that judgment, and their state court case to enforce it was filed after the District Court entered final judgment in federal court in this case. So there obviously was no pending state court proceeding to enforce that judgment. The other argument is that this proceeding in federal court was just kind of too close to an interference with the state judgment that is sitting out there in state court. But this court has a jurisprudence of when a case properly in federal court is just kind of getting too close to something that might happen in state court. And it's the Texas Employers Insurance Association case and the Travelers Insurance case. And the key point is that the city and county have never engaged with those decisions because they obviously lose under the test that this court has articulated. Texas Employers Insurance requires a pending state court proceeding that will imminently present and will imminently resolve the same question presented in federal court. Those things are not true here. And Travelers Insurance creates an exception in any event in circumstances where the federal plaintiff is pursuing the legitimate purposes of the Declaratory Judgment Act. Well, Union Pacific here was doing exactly what the Declaratory Judgment Act was passed to enable. Union Pacific is a party to a contract in doubt about its legal obligations that needs clarity about those obligations prior to taking the irrevocable step that would be breach. The remedy under the 1954 agreement, if Union Pacific breaches, is an election by the city and county between specific performance and reinstatement of the 1914 judgment. If Union Pacific breached this, they could elect to seek reinstatement of the 1914 judgment. I promise they would then argue that Union Pacific is obliged to move its entire headquarters from to take that step without clarity about its legal rights. So it did exactly what the Declaratory Judgment Act was designed to enable. It went to court to seek a declaration about whether this contract is preempted by federal law or not. And it got that determination. The point of the act is you have to be able to tell whether something is a mushroom or a toadstool without eating it. And that's a perfectly legitimate use of the Declaratory Judgment Act. If the court has any questions, I'd be delighted to try and answer them. But if not, I will yield. All right. Thank you. Thank you, sir. Brief rebuttal, Your Honor. Your Honors, first of all, the state court proceeding is and has remained pending. The 1954 agreement was entered as a 1955 state court judgment. And that is the proceeding that is now live in state court as a result of Union Pacific attempting to prematurely terminate its employees under a non-final federal court decision. So there definitely is a pending state court proceeding. Second, the remedy, as clear from the contract, as a basis to bring a preemption action as a declaratory judgment, the plaintiff must be under threat of an actual claim. That is not the case here. The City of Palestine and Anderson County have never asserted that they intend to seek any reinstatement of the 1914 judgment. Frankly, the 1954 agreement itself makes it clear that that's not viable. The city and county have an election that they could make, and they have elected to seek specific performance. That is, they've elected to ask Union Pacific to do exactly what it agreed to do. Nothing more, no reinstatement of the 1914 judgment. The other matters that were brought up by counsel, the 1977 decision, I think, is important of this court because in that court, the Union Pacific, at that time, had entered into bankruptcy as well, and they were trying to avoid this obligation that they had assumed. And they were faced with the situation of the federal bankruptcy law, not the Texas SHOP Acts, not the contractor agreement to have a City of Palestine. The federal bankruptcy law said, no, you can't do a reorganization to avoid these obligations once they've been entered into a state judgment, as they had been in 1955. They then asked the Interstate Commerce Commission, said, well, you have some preemption authority, and it did, just set aside this agreement, and that's what came before this court. And this court correctly held in the 1977 decision, no, you can't set aside this 54 agreement because it's not stopping the merger. It's not necessary to set it aside to prevent the merger between MOPAC and the International Great Northern. In fact, that merger had already begun, and it went forward. But, of course, it went forward with MOPAC voluntarily saying, you know what, it's worth it. We could sit back and wait for the International Great Northern to be liquidated in bankruptcy and try to buy up in the market its assets, but we want all of them. So we'll take this 54 agreement with its employment obligation in order to do that. Fast forward to what happened when then MOPAC went into bankruptcy. Same thing. The Union Pacific could have sat back and said, we're going to wait and pick up these assets and not be obligated to do anything with the City of Palestine because the 54 agreement clearly goes away when the railroad ceases to operate. But no, we want everything that MOPAC has, and we're willing to take this obligation in order to get those assets in total. That's a voluntary decision. That's a voluntary agreement. They're not compelled to do so anymore than International Great Northern was or than MOPAC was. So we are back where we started. What do we regulate? We regulate employment. Who gets to choose the employees? Union Pacific does. Are they operating? Are they having a direct effect on transportation? No, they're not. They could be anybody from the CEO to the custodial staff in one of the home employees, such as we now see very prevalent in the marketplace. There is no regulatory or undue influence being exercised for this agreement, and this Court should have held the bargain that the parties made when they accepted it. Thank you.